**John A. MUSTARD, Executor of the Estate of Andrew C. Hebble, Deceased,**

v.

**The UNITED STATES.**

**No. 341-52.**

United States Court of Claims.

Oct. 9, 1957.

---

** Now 10 U.S.C.A. § 876.

Allen H. Gardner, Washington, D. C., for plaintiff. Mustard, Clagett & Everett, Battle Creek, Mich., and Morris, Pearce, Gardner & Pratt, Washington, D. C., were on the briefs.

James P. Garland and Herbert S. Fessenden, Washington, D. C., with whom was Asst. Atty. Gen. Charles K. Rice, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

PER CURIAM.

This case was referred by the court, pursuant to Rule 45(c), 28 U.S.C.A., to Mastin G. White, a commissioner of the court, with directions to make findings of fact and recommendations for conclusions of law. The commissioner has done so in a report filed August 8, 1957. When more than 15 days elapsed after the filing of this report·and neither party gave notice in writing of an intention to except to the commissioner's findings or recommendations, the plaintiff filed a motion for judgment in accordance with the recommendations of the commissioner. Since the court agrees with the recommendations and findings of the commissioner, as hereinafter set forth, it hereby adopts the same as the basis of its judgment in this case. Plaintiff is therefore entitled to recover, together with interest as provided by law, and judgment is entered to that effect. The amount of recovery will be determined pursuant to Rule 38(c).

It is so ordered.

The opinion of the commissioner follows:

This action was originally instituted by Andrew C. Hebble, of Battle Creek, Michigan, to recover amounts paid by him to the defendant as income tax deficiencies and interest for the years 1943 and 1944. Mr. Hebble later died and John A. Mustard, the duly appointed executor of his estate, was substituted as the party plaintiff.

The legal question involved in the case is whether Mr. Hebble was entitled, in computing his income taxes for the years 1943 and 1944, to treat as a charitable contribution in each of those years an assignment to the Battle Creek Kiwanis Club of a one-tenth interest in a certain promissory note having a face value of $29,250.

The statutory provision involved in this litigation is Section 23(o) of the Internal Revenue Code of 1939, as

amended, 26 U.S.C.A. § 23(o). In 1943, the section provided in pertinent part as follows:

"§ 23. Deductions From Gross Income.

"In computing net income there shall be allowed as deductions:

\*    \*    \*    \*    \*    \*

"(o) Charitable and other contributions. In the case of an individual, contributions or gifts payment of which is made within the taxable year to or for the use of:

\*    \*    \*    \*    \*    \*

"(2) A corporation, trust, or community chest, fund, or foundation, created or organized in the United States or in any possession thereof or under the law of the United States or of any State or Territory or of any possession of the United States, organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation;

\*    \*    \*    \*    \*    \*

to an amount which in all the above cases combined does not exceed 15 per centum of the taxpayer's net income as computed without the benefit of this subsection or of subsection (x). Such contributions or gifts shall be allowable as deductions only if verified under rules and regulations prescribed by the Commissioner, with the approval of the Secretary."[1]

As applicable to the year 1944, the language quoted above was revised slightly by striking out "net income as computed without the benefit of this subsection or

---

1. 53 Stat. 14–15, as amended by Sec. 224 (a) of the Revenue Act of 1939, 53 Stat. 862, 880, and Sec. 127(c) of the Revenue Act of 1942, 56 Stat. 798, 826.

of subsection (x)" and inserting in lieu thereof "adjusted gross income".[2]

Since the assignment to the Kiwanis Club by Mr. Hebble of interests in the $29,250 promissory note was incidental to the establishment by Mr. Hebble of a trust known as The Esther H. Hebble Memorial Trust, it is necessary to outline in some detail the facts pertaining to that trust.

For many years prior to 1943, Mr. Hebble was a successful undertaker in Battle Creek. As an adjunct to that business, he had organized a cemetery corporation known as the Battle Creek Memorial Park Association. As of September 17, 1943—a date that will be referred to frequently in this opinion—Mr. Hebble was the president of the corporation, and he owned 300 shares of stock in the corporation out of a total capitalization of 400 shares.

The Battle Creek Memorial Park Association was organized for the purpose of owning and operating a cemetery. The cemetery, known as the Memorial Park Cemetery, is located on the outskirts of Battle Creek. By September 17, 1943, the cemetery was a valuable property. It was beautifully landscaped and maintained, and it was well established as a business enterprise.

Mr. Hebble had been an active member of the Battle Creek Kiwanis Club for many years prior to 1943. The club, although not primarily a charitable organization, carried on an extensive social welfare program among the children and young people of Battle Creek and vicinity. Mr. Hebble, who did not have any children of his own, was very much interested in these social welfare activities of the Kiwanis Club for the benefit of children and young people. Over a period of years, he made statements indicating that, because he regarded the Kiwanis Club as a good handler of money, he proposed to give money to the club for use in behalf of boys and girls.

In 1943, after the death of his wife, Esther H. Hebble, to whom he had been very devoted, Mr. Hebble became more specific in statements to the effect that he wanted to do something through the Kiwanis Club for children. Mr. Hebble was then about 80 years old.

Mr. Hebble knew that his long-time friend, Eugene H. McKay, also of Battle Creek and also a member of the Kiwanis Club, had established a small trust fund with the Kiwanis Club to help college students. Sometime in 1943, Mr. Hebble approached Mr. McKay and stated that he wanted to have something similar, except that he wanted to benefit children who were younger than college students. Mr. Hebble informed Mr. McKay that, as a memorial to his wife, he would like to give all his stock in the Battle Creek Memorial Park Association to the Kiwanis Club, and make a loan to the club so that it could purchase the remaining shares of stock in the cemetery corporation owned by other persons. Mr. Hebble indicated that it was his purpose that the profits from the operation of the cemetery should be used by the Kiwanis Club exclusively for the benefit of underprivileged children, and for character-building programs among children generally, in the Battle Creek area, including boys and girls of high school age. Mr. Hebble asked Mr. McKay to confer with officers and directors of the Kiwanis Club and ascertain whether they would be receptive to such a proposal. Mr. McKay agreed to do so.

Mr. McKay first presented Mr. Hebble's proposal orally to the president and secretary of the Battle Creek Kiwanis Club; and thereafter he orally presented the proposal to the board of directors of the club.

After Mr. McKay's presentation, the president of the Kiwanis Club had a conference with Mr. Hebble. Mr. Hebble again outlined his proposal in language similar to that previously used by him in the discussion with Mr. McKay. Mr. Hebble made it plain that he would ex-

2. This amendment was effected by Sec 8(b) of the Individual Income Tax Act of 1944, 58 Stat. 231, 236.

pect the Kiwanis Club to use the cemetery profits exclusively for the benefit of underprivileged children and to promote character building among children generally, including boys and girls of high school age.

Following his conversation with Mr. Hebble, the president of the Kiwanis Club reported on it to the club's board of directors. The members of the board then unanimously approved the acceptance of Mr. Hebble's proposal.

Being apprised of the willingness of the Kiwanis Club to accept his proposal, Mr. Hebble on September 17, 1943 transferred his 300 shares of stock in the Battle Creek Memorial Park Association to the Kiwanis Club of Battle Creek. A document that was signed contemporaneously by Mr. Hebble and the Kiwanis Club (acting through its president and secretary) declared that the shares of stock were transferred to the club as trustee and were to be held in trust. The document was denominated a "Trust Instrument", and the resulting trust was designated as "The Esther H. Hebble Memorial Trust".[3]

With money loaned to the club by Mr. Hebble, the Kiwanis Club of Battle Creek on September 17, 1943 acquired from other persons 99 shares of stock in the Battle Creek Memorial Park Association, and the club on September 20, 1943 acquired from still another person 1 share of stock in the cemetery corporation. Therefore, the Kiwanis Club of Battle Creek held the legal title to all the shares of stock in the Battle Creek Memorial Park Association on and after September 20, 1943.

During the conversations that Mr. Hebble had with Mr. McKay and the president of the Kiwanis Club concerning the establishment of The Esther H. Hebble Memorial Trust, Mr. Hebble indicated that, since it might be advisable to delay the withdrawal of profits from the cemetery corporation for the purposes outlined by Mr. Hebble, he proposed to assign a promissory note to the

Kiwanis Club so that funds would be available for such purposes at an earlier time than might otherwise be the case if the project were to be wholly dependent upon cemetery profits. Mr. Hebble made it plain that the proceeds from the note were to be used by the Kiwanis Club exclusively for the same purposes as the profits from the operation of the cemetery, i. e., for the benefit of underprivileged children and for character-building activities among children generally, including boys and girls of high school age.

Information concerning Mr. Hebble's intentions relative to the transfer of a promissory note was furnished to the board of directors of the Kiwanis Club as part of the discussion regarding the establishment of The Esther H. Hebble Memorial Trust. The board of directors approved the proposed arrangement respecting the note along with the proposed arrangement regarding the shares of stock in the cemetery corporation.

In furtherance of his plan with respect to the note assignment, Mr. Hebble on September 17, 1943 had the Battle Creek Memorial Park Association execute a promissory note in the face amount of $29,250 payable on demand to him "or his assigns", and bearing interest at the rate of 6 per cent per annum. This note represented a consolidation of three promissory notes that Mr. Hebble had held against the cemetery corporation for a number of years, $29,250 being the aggregate amount of the principal that was still due on the three prior notes as of September 17, 1943. Immediately after the execution of the $29,250 note, Mr. Hebble signed an assignment, which had been prepared on the same sheet with, and below, the note and which read in part as follows:

"To Battle Creek Memorial Park Association:

"Please Take Notice, that an undivided one-tenth interest in the foregoing note is hereby immediately assigned to Kiwanis Club of Battle

---

3. Further details regarding the trust instrument will be found in finding 9.

Creek, and that on each anniversary of the date of said note an additional one-tenth interest in said note shall be deemed, and shall be automatically assigned by virtue hereof to said Kiwanis Club of Battle Creek until said note and all right, title and interest therein and thereunder shall belong solely to and become and be exclusively the property of said Kiwanis Club of Battle Creek, provided that said Kiwanis Club of Battle Creek shall continue at all times during said period to act faithfully as trustee under The Esther H. Hebble Trust created by said Andrew C. Hebble as settlor by written instrument dated the 17th day of September, 1943, and said assignment shall be in consideration of such service."

The trust instrument of September 17, 1943 creating The Esther H. Hebble Memorial Trust also contained a paragraph referring to the contemporaneous assignment of the promissory note dated September 17, 1943. That paragraph stated in part as follows:

"Sixth

"In consideration of acceptance by said Kiwanis Club of the trust hereby created, the Settlor hereby assigns to said Kiwanis Club in its own right, and not in trust, an undivided one tenth (1/10) interest in a certain note in the principal sum of Twenty-nine Thousand Two Hundred Fifty ($29,250) Dollars, dated the 17th day of September, 1943, bearing interest at the rate of six (6%) per cent per annum, executed by said Association, as maker, to said Settlor as payee, and for each consecutive year after the date hereof in which said Kiwanis Club, as trustee, shall faithfully exercise said trust this instrument shall automatically operate as an assignment to said Kiwanis Club (in its own right and not in trust) of an additional undivided one-tenth (1/10) interest in said note, so that at the end of ten (10) years after the date

hereof, said Kiwanis Club shall be the sole owner of said note * *."

It will be noted that the written documents quoted above, in so far as they indicated that the Kiwanis Club was to receive annually a one-tenth interest in the $29,250 note as compensation for services rendered by the club as trustee of The Esther H. Hebble Memorial Trust, were inconsistent with the oral understanding of the parties that the Kiwanis Club was to receive and use the proceeds from the assigned note exclusively for the benefit of children.

The evidence does not show who drafted the note assignment or the reference to the note assignment in the sixth paragraph of the instrument creating The Esther H. Hebble Memorial Trust; and there is no direct evidence to show whether such provisions were read and understood by the parties prior to or at the time of the signing of the respective documents. However, the circumstantial evidence warrants the inference that the note assignment was signed by Mr. Hebble, and the trust instrument was signed by Mr. Hebble and officers of the Kiwanis Club, in ignorance of the fact that such documents contained provisions inconsistent with the oral understanding of the parties that the Kiwanis Club was obligated to use the proceeds from the note exclusively for the benefit of underprivileged children and for character-building programs among children generally, including boys and girls of high school age.

Subsequent to September 17, 1943, the parties apparently acted on the basis of an assumption that their oral understanding referred to above was a binding commitment upon the Kiwanis Club of Battle Creek. As interest became due under the $29,250 promissory note, the Kiwanis Club promptly collected all the interest due it. In addition, the club has, through the years, collected partial payments of principal aggregating $14,000. These proceeds from the note have been used by the Kiwanis Club exclusively for objects that were regarded by the club's board of directors as being within the

scope of the purposes orally specified by Mr. Hebble—i. e., for the benefit of underprivileged children, and for character-building programs among children generally, in the Battle Creek area. None of the proceeds has ever been used to defray expenses of the Kiwanis Club, including expenses incurred by the club in the administration of the Hebble gift. Hence, it seems to be clear that the Kiwanis Club has not regarded the proceeds from the note as compensation for services rendered by the club, and thus available for expenditure within the discretion of the club.

In preparing his income tax returns for the years 1943 and 1944, Mr. Hebble included among his charitable contributions for each of those years the amount of $2,925 representing the assignment to the Kiwanis Club during the particular year of a one-tenth interest in the promissory note dated September 17, 1943. In effect, only $2,272.99 of the $2,925 listed in the 1943 income tax return was deducted by Mr. Hebble from income, because of the statutory 15-percent limitation that was applicable to charitable contributions under Section 23(o) of the Internal Revenue Code of 1939, as amended. The full amount of $2,925 was deducted from income by Mr. Hebble in computing the amount of his income tax for 1944, as the total amount of his claimed charitable contributions in that year did not exceed the 15-percent limitation.

The Commissioner of Internal Revenue subsequently held that no part of the amounts claimed by Mr. Hebble as charitable contributions in 1943 and 1944 on the basis of the assignment to the Kiwanis Club of one-tenth interests in the note dated September 17, 1943 could be deducted in computing Mr. Hebble's income tax liability. The Commissioner disallowed Mr. Hebble's deduction for charitable contributions in 1943 to the extent of $2,272.99, and he disallowed Mr. Hebble's deduction for charitable contributions in 1944 to the extent of $2,925. The Commissioner also made an adjustment in Mr. Hebble's 1943 income tax return respecting another matter that is not questioned by the plaintiff in the present litigation. The adjustments made by the Commissioner resulted in the determination of an income tax deficiency against Mr. Hebble for 1943 in the amount of $1,523.22, plus interest amounting to $464.58, and a deficiency for 1944 in the amount of $2,216.46, plus interest amounting to $543.03. The deficiencies and interest were paid by Mr. Hebble on April 25, 1949.

Claims for refund respecting the 1943 and 1944 deficiencies and interest mentioned above were subsequently filed by Mr. Hebble with the Internal Revenue Service. Each claim was based upon the ground that the amount of $2,925 representing the assignment to the Kiwanis Club in the particular year of a one-tenth interest in the note dated September 17, 1943 was properly deductible as a charitable contribution (subject to the 15-percent limitation in 1943). Mr. Hebble's claims were disallowed by the Internal Revenue Service, whereupon he instituted the present suit in the Court of Claims.

The only real issue in the case is whether the court can properly consider the oral understanding between Mr. Hebble and the Battle Creek Kiwanis Club concerning the purposes for which the proceeds received by the club from the promissory note of September 17, 1943 should be used.

In connection with the problem outlined in the preceding paragraph, the defendant points to the statement in the written assignment expressly declaring that "said assignment shall be in consideration of * * * service" rendered by the Kiwanis Club as trustee under The Esther H. Hebble Memorial Trust, and to the portion of the instrument creating The Esther H. Hebble Memorial Trust which referred to the contemporaneous assignment of the note in the following language:

"In consideration of acceptance by said Kiwanis Club of the trust hereby created, the Settlor hereby assigns to said Kiwanis Club in its

own right, and not in trust, an undivided one tenth (1/10) interest in a certain note in the principal sum of \* \* \* $29,250 \* \* \*, and for each consecutive year after the date hereof in which said Kiwanis Club, as trustee, shall faithfully exercise said trust this instrument shall automatically operate as an assignment to said Kiwanis Club (in its own right and not in trust) of an additional undivided one-tenth (1/10) interest in said note \* \* \*."

The defendant asserts that, in view of the parol evidence rule,[4] the written statements quoted above from the documents signed by the parties, indicating that the Kiwanis Club was to receive annually a one-tenth interest in the note as compensation for its services as trustee of The Esther H. Hebble Memorial Trust, preclude the court from considering evidence relative to an inconsistent oral understanding of the parties which obligated the Kiwanis Club to use the proceeds from the note exclusively for the benefit of children in the community.

However, as Professor Wigmore has said, there is no magic in a written instrument itself, since a writing has no efficacy per se.[5] Consequently, in a situation (such as the one involved in this case) where parties have reached an oral agreement and then sign a written document which supposedly incorporates the agreement but actually contains terms varying from the understanding of the parties, the instrument itself is not the actual agreement. Rather, the agreement is found in the parties' common supposition of what the instrument contained. In such a situation, the parties themselves can utilize parol evidence to

have the instrument judicially amended so that it will represent the actual agreement.[6]

In any event, the parol evidence rule is applicable only to cases involving controversies between the parties to a written instrument, and persons claiming under them. As the defendant was a stranger to the transaction between Mr. Hebble and the Kiwanis Club respecting the note dated September 17, 1943 and does not assert a claim of any sort derived from either party to that transaction, the defendant cannot invoke the parol evidence rule to exclude evidence concerning the oral understanding of the parties to the transaction. American Crystal Sugar Co. v. Nicholas, 10 Cir., 1941, 124 F.2d 477, 479; Haverty Realty & Investment Co., 1944, 3 T.C. 161, 167.

It is my opinion, therefore, that the court may properly receive and consider parol evidence to ascertain the true understanding of the parties concerning the purposes for which the proceeds from the assigned promissory note of September 17, 1943 were to be used by the Kiwanis Club.

As a related point, the defendant contends that, under the Michigan version of the statute of frauds, an attempt to create a trust of personalty by parol is invalid. It is unnecessary to decide this question.[7] The statute of frauds is intended for the protection of parties only, being designed to enable parties to certain types of transactions to escape liabilities and duties assumed orally but not in writing. Consequently, strangers to an oral trust cannot attack it on the ground of the lack of a written

4. This rule is to the effect that a written contract cannot be contradicted or modified by any contemporaneous oral statements which the parties may have made. National Cash Register Co. v. Verbrugge, 1933, 263 Mich. 243, 248 N.W. 608, 609.

5. Wigmore on Evidence (3d ed.), Vol. IX, p. 5.

6. Wigmore on Evidence (3d ed.), Vol. IX, p. 59.

7. But see Bostwick v. Mahaffy, 1882, 48 Mich. 342, 12 N.W. 192; Rice v. Rice, 1895, 107 Mich. 241, 65 N.W. 103; Bogert, Trusts and Trustees (1951 ed.), Vol. 1, p. 372; Restatement of the Law of Trusts (American Law Institute), Vol. I, Sec. 52, p. 152.

statement of the trust.[8] It follows that the defendant in the present case cannot avail itself of any argument based upon the statute of frauds in attacking the oral understanding between Mr. Hebble and the Battle Creek Kiwanis Club respecting the latter's obligation to devote the proceeds from the assigned promissory note of September 17, 1943 to purposes specified by Mr. Hebble.

Moreover, it will be noted from the provisions of Section 23(o) of the Internal Revenue Code of 1939 previously quoted that contributions to a "fund" organized and operated exclusively for charitable purposes were properly deductible from income in 1943 and 1944. Even if, by reason of the Michigan version of the statute of frauds or otherwise, the transaction between Mr. Hebble and the Kiwanis Club relative to the note assignment did not amount to the creation of a valid trust, the oral understanding of the parties at least contemplated that the proceeds from the assigned note would constitute a fund to be used by the Kiwanis Club exclusively for the benefit of children. That such a fund was not already in existence, but was created by the oral understanding between the parties, did not take the transaction outside the scope of Section 23(o) of the Internal Revenue Code of 1939. Bok v. McCaughn, 3 Cir., 1930, 42 F.2d 616, 618.

There does not appear to be any controversy between the parties over the question whether Mr. Hebble actually contributed $2,925 to the Kiwanis Club in 1943 and $2,925 in 1944 by assigning to the club each year a one-tenth interest in the $29,250 promissory note. Furthermore, there seems to be no controversy as to whether the purpose of the contributions—i. e., to benefit underprivileged children and to promote character building among children generally —was within the scope of the term "charitable * * * purposes", as used in Section 23(o) of the Internal Revenue Code of 1939. In this connection, it may be noted that the courts have placed a very broad interpretation upon the term "charitable". For example, the Supreme Court in Ould v. Washington Hospital for Foundlings, 1877, 95 U.S. 303, 311, 24 L.Ed. 450, quoted with apparent approval a definition of the term that included "Whatever is given for the love of God, or the love of your neighbor, in the catholic and universal sense,— given from these motives and to these ends, free from the stain or taint of every consideration that is personal, private, or selfish". Also see Bok v. McCaughn, supra, 42 F.2d at pages 618–619, and Isabel Peters, 1953, 21 T.C. 55, 59.

For the reasons outlined in this opinion, it is my view that Mr. Hebble, in computing his income tax for the year 1943, was entitled to deduct from income as a charitable contribution the sum of $2,272.99 representing part of the one-tenth interest in the promissory note dated September 17, 1943 that he assigned to the Kiwanis Club in that year (the remainder of the gift being affected by the statutory 15-percent limitation on charitable contributions); and that in computing his income tax for 1944, he was entitled to deduct from income as a charitable contribution the sum of $2,925 representing the assignment of the one-tenth interest in the promissory note dated September 17, 1943 that became effective in 1944. It follows that the plaintiff in the present case is entitled to recover because of the actions of the Commissioner of Internal Revenue in refusing to permit Mr. Hebble to make any deduction from income on the basis of these assignments.

Since it does not clearly appear from the evidence to what extent the deficiency and interest for 1943 were allocable to the partial disallowance of Mr. Hebble's contributions deduction, and to what extent they were allocable to another adjustment that is not questioned by the plaintiff, the amount of the plaintiff's judgment should be left for determination pursuant to further proceedings under Rule 38(c).

8. Bogert, Trusts and Trustees (1951 ed.), Vol. 1, pp. 415–416.

### Findings of Fact.

1. This action was brought by Andrew C. Hebble, a citizen of the United States and a resident of Battle Creek, Michigan. Mr. Hebble, subsequently died, and John A. Mustard, also a citizen of the United States and a resident of Battle Creek, was appointed executor of Mr. Hebble's estate by the Probate Court for the County of Calhoun, State of Michigan. Thereafter, by an order of the United States Court of Claims, John A. Mustard, in his capacity as executor, was substituted as the party plaintiff in this action.

2. Prior to 1943, Mr. Hebble had engaged in the undertaking business at Battle Creek for many years. As an adjunct to that business, Mr. Hebble was instrumental in organizing a cemetery corporation known as the Battle Creek Memorial Park Association, which was incorporated in 1926 under the laws of the State of Michigan. Up until September 17, 1943, Mr. Hebble was the majority stockholder and president of the corporation. On the date mentioned, Mr. Hebble owned 300 shares of stock in the cemetery corporation out of a total capitalization of 400 shares.

3. The corporation mentioned in finding 2 was organized for the purpose of owning and operating a cemetery. The cemetery, known as the Memorial Park Cemetery, is located on the outskirts of Battle Creek. Mr. Hebble, as the president of the corporation owning the cemetery, used the services of a well-known and very able landscape artist in the development of the cemetery. It soon became a beautiful place, and it has subsequently been maintained in that condition. As of September 17, 1943, the Battle Creek Memorial Park Association and the cemetery were well established and highly regarded by the public in Battle Creek and vicinity. The cemetery was a valuable property.

### Creation of The Esther H. Hebble Memorial Trust.

4. (a) For many years prior to 1943, Mr. Hebble had belonged to the Kiwanis Club of Battle Creek. Mr. Hebble was one of the oldest members of the club. He was faithful in attendance at its meetings, he had great faith in the club, and he had a high opinion of the membership.

(b) The Kiwanis Club has been established in Battle Creek for a long time. Its membership has consisted of well-known and reputable businessmen there.

5. Although not primarily a charitable organization, the Kiwanis Club of Battle Creek prior to 1943 had devoted substantial amounts of its funds and energies to the promotion of social welfare work among the children and young people of Battle Creek and vicinity. Among the long-standing activities of the Kiwanis Club in this field were the active support of the Boy Scouts, the Girl Scouts, and the Camp Fire Girls, the provision of warm breakfasts for school children, and the operation of the Ki-Y Club to take teen-age boys and girls off the streets and provide entertainment and sociability for them on Friday and Saturday nights under proper supervision and amid wholesome surroundings. Mr. Hebble was aware of and very much interested in these social welfare activities conducted by the Battle Creek Kiwanis Club for the benefit of children and young people. Mr. Hebble and his wife did not have any children of their own.

6. Over a period of years prior to 1943, Mr. Hebble made statements indicating that, because he regarded the Kiwanis Club as a good handler of money, he proposed to give money to the club for use in behalf of boys and girls. In 1943, after the death of his wife, Esther H. Hebble, to whom he had been very devoted, Mr. Hebble became more specific in statements to the effect that he wanted to do something through the Kiwanis Club for children, and especially underprivileged children. Mr. Hebble was then about 80 years old.

7. Mr. Hebble knew that his longtime friend, Eugene H. McKay, also of Battle Creek and also a member of the Kiwanis Club, had established a small

trust fund with the Kiwanis Club to help college students. Sometime in 1943, Mr. Hebble approached Mr. McKay and stated that he wanted to have something similar, except that he wanted to benefit children who were younger than college students. Mr. Hebble informed Mr. McKay that, as a memorial to his wife, he would like to give all his stock in the Battle Creek Memorial Park Association (300 shares out of a total of 400 shares) to the Kiwanis Club, and make a loan to the club so that it could purchase the remaining shares of stock in the cemetery corporation owned by other persons, with the Kiwanis Club thereby becoming the sole owner of the stock in the cemetery corporation. Mr. Hebble indicated that it was his purpose that the Kiwanis Club should maintain and operate the cemetery corporation and cemetery in the future on the same basis that Mr. Hebble had maintained and operated them theretofore and that the profits from the operation of the cemetery should be used for the benefit of underprivileged children, and for character-building programs among children generally, in the Battle Creek area, including children of high school age. Mr. Hebble made it plain that he would expect the Kiwanis Club to use the cemetery profits exclusively for the purposes outlined by him, and that the beneficiaries were to be the children of the Battle Creek community, including those of high school age. Mr. Hebble asked Mr. McKay to confer with officers and directors of the Kiwanis Club and ascertain whether they would be receptive to such a proposal as that outlined by Mr. Hebble. Mr. McKay agreed to do so.

8. (a) Following the discussion between Mr. Hebble and Eugene H. McKay mentioned in finding 7, Mr. McKay first presented Mr. Hebble's proposal orally to the president and secretary of the Battle Creek Kiwanis Club. Thereafter, Mr. McKay orally presented the proposal to the board of directors of the Kiwanis Club. Initially, the matter was presented to the board merely for consideration, and not for acceptance or rejection of the proposal at that time. Some of the members of the board were skeptical about the feasibility of entering into the arrangement proposed by Mr. Hebble, as they anticipated that the maintenance and operation of the cemetery would involve difficulties and complications for the Kiwanis Club.

(b) Thereafter, the president of the Kiwanis Club had a conference with Mr. Hebble concerning the matter. At the conference between the president of the Kiwanis Club and Mr. Hebble, the latter outlined his proposal in language similar to that previously used by Mr. Hebble in the discussion with Mr. McKay. Mr. Hebble stated that he wanted the profits from the operation of the cemetery to be used exclusively for the benefit of underprivileged children, and to promote character building among children generally, in the Battle Creek area.

(c) Following his conversation with Mr. Hebble, the president of the Kiwanis Club reported on it to the club's board of directors. At that time, the members of the board unanimously approved the acceptance of Mr. Hebble's proposal.

9. (a) Being apprised of the willingness of the Kiwanis Club to accept his proposal, Mr. Hebble on September 17, 1943 transferred his 300 shares of stock in the Battle Creek Memorial Park Association to the Kiwanis Club of Battle Creek. Contemporaneously, he and the Kiwanis Club (acting through its president and secretary) signed a document that was denominated a "Trust Instrument". This instrument recited that Mr. Hebble, the settlor, had assigned 300 shares of stock in the cemetery corporation to the Kiwanis Club as trustee, in trust for the purposes thereinafter expressed, and that the trust should be known as "The Esther H. Hebble Memorial Trust".

(b) It was provided in the trust instrument that at the annual meeting of the cemetery corporation's shareholders, and at every shareholders' meeting at which any directors of the cemetery corporation should be elected, all shares held by the Kiwanis Club should be voted

by the club president or other designated club officer or director in favor of the election of such directors of the cemetery corporation as should have been selected by the Kiwanis Club's board of directors, and that at all times at least a majority of the cemetery corporation's directors should be members of the Kiwanis Club.

(c)   It was also provided in the trust instrument that the shares of stock in the cemetery corporation should remain at 400 shares of common stock, that no other or different class of stock should ever be authorized, and that the shares forming the corpus of the trust should never ·be sold, pledged, hypothecated, or otherwise disposed of by the Kiwanis Club.

(d)   The trust instrument further provided in part as follows:

"Fourth

"The shares of stock of said Association shall remain as now authorized, namely four hundred (400) shares of common stock of the par (or face) value of Ten ($10) Dollars per share, and no other or different class of stock ever shall be authorized.  The shares forming the corpus of this trust never shall be sold, pledged, hypothecated or otherwise encumbered or disposed of by said Kiwanis Club, trustee, except that in case of emergency a court of equity of competent jurisdiction may invoke and exercise the doctrine of *cy pres* for preservation and attainment of the purposes of said Association.

"Fifth

"Said Association is the proprietor of Memorial Park Cemetery, in the township of Battle Creek, Calhoun County, Michigan, embracing lands which it has acquired and holds, and which, to a substantial extent it has laid out, improved, embellished and maintained in good order, in accordance with the purposes of said Association, which are declared in its Articles of Incorporation to be,

" 'To acquire, hold, own, lay out, improve, embellish and maintain in good order a cemetery in the township of Battle Creek, in the County of Calhoun, State of Michigan, and when payments for lands purchased shall have been fully made, to reserve at least two-thirds (⅔) of all the receipts of such corporation which shall be derived from the sale of burial rights after payment of the current expenses for interest, improvements and embellishing, until the aggregate amount shall, in the opinion of the board of directors, be sufficient to constitute a permanent fund which, when invested, shall produce an income large enough to meet the expense of keeping the grounds of such cemetery perpetually in good condition after the ·same shall have once been properly laid out, improved and embellished according to the plan thereof, and to invest the receipts to be reserved as aforesaid in bonds of the United States, or of the State of Michigan, or of Municipal Corporations of this state, or as otherwise may be provided by the laws of said state, and to use the income only for the said purposes for which said fund is so reserved,' and it is hereby made the duty of said Kiwanis Club, as trustee, through its stock control, to see to it that said purposes, as far as is reasonably possible, are attained.

\*     \*     \*     \*     \*     \*

"Seventh

"When all lands now or hereafter embraced in said Memorial Park Cemetery, or acquired by said Association for cemetery purposes, shall have been fully paid for and shall have been properly land [sic] out, improved and embellished in accordance with the best cemetery practice then observed in leading and comparable cemeteries, and when the permanent fund for the perpetual care of the lands so laid out shall have been accumulated, as

required by law and the articles of incorporation of said Association, said Kiwanis Club shall be entitled to receive annually, and to retain, as compensation for its services as trustee hereunder, all surplus net profits thereafter arising to said Association, and it is hereby provided that no dividends shall ever be declared or paid upon the shares of said Association, except from such surplus net profits as are last above designated.

"Eighth

"Any property, real or personal, derived by said Association or said Kiwanis Club, as trustee hereunder, by reason of any gift, devise or bequest, shall be used to augment said permanent fund for perpetual care unless otherwise directed by the donor or testator making such a gift, devise or bequest.

"Ninth

"The articles of incorporation of said Association never shall be amended in any such manner as to change the provisions thereof set forth in Paragraph "Fifth" of this instrument, nor shall any amendment or repeal of the statute under which said Association was organized operate to reduce the requirements herein contained with respect to said permanent fund for perpetual care. * * *"

(e) The transferred stock certificates and the trust instrument were delivered to the Kiwanis Club.

10. With money loaned to the club by Mr. Hebble, the Kiwanis Club on September 17, 1943 acquired from other persons 99 shares of stock in the Battle Creek Memorial Park Association, and the club on September 20, 1943 acquired from still another person 1 share of stock in the cemetery corporation. Therefore, as of September 20, 1943, the Kiwanis Club of Battle Creek held the legal title to all the shares of stock in the Battle Creek Memorial Park Association.

11. (a) The Kiwanis Club of Battle Creek has continued to hold the legal title to all the stock in the Battle Creek Memorial Park Association since September 1943. Through such ownership, the club has elected the directors of the cemetery corporation, and, with one exception, the club has not elected anyone as a director who was not a member of the Kiwanis Club. The club has, through this election of the cemetery corporation's directors—who have, in turn, elected the officers of the corporation—controlled the management of the cemetery corporation and the operation of Memorial Park Cemetery in accordance with the trust instrument of September 17, 1943 and the articles of incorporation and bylaws of the Battle Creek Memorial Park Association.

(b) The Kiwanis Club has always faithfully carried out its duties as trustee of The Esther H. Hebble Memorial Trust.

(c) The Kiwanis Club, in maintaining and operating the cemetery corporation and the cemetery, has followed the course charted for the club by Mr. Hebble. For approximately 10 years after September 17, 1943, Mr. Hebble continued to serve as president of the Battle Creek Memorial Park Association (being retained in the presidency by the directors elected by the Kiwanis Club). During that 10-year period, he taught personnel of the Kiwanis Club how to run the cemetery corporation and the cemetery.

12. In the present litigation, the plaintiff does not base any claim upon the transfer by Mr. Hebble of the 300 shares of stock in the Battle Creek Memorial Park Association to the Kiwanis Club.

Assignment of Promissory Note.

13. (a) During the conversations that Mr. Hebble had with Mr. McKay and the president of the Battle Creek Kiwanis Club concerning the establishment of The Esther H. Hebble Memorial Trust (see findings 7 and 8), Mr. Hebble indicated that, since it might be ad-

visable to delay the withdrawal of profits from the cemetery corporation for the purposes outlined by Mr. Hebble, he proposed to assign a promissory note to the Kiwanis Club so that funds would be available for such purposes at an earlier time than might otherwise be the case if the project were to be wholly dependent upon cemetery profits. Mr. Hebble made it plain that the proceeds from the note were to be used by the Kiwanis Club exclusively for the same purposes as the profits from the operation of the cemetery.

(b) Information concerning Mr. Hebble's intentions relative to the assignment of a promissory note was furnished to the board of directors of the Kiwanis Club as part of the discussions regarding the establishment of The Esther H. Hebble Memorial Trust. The board of directors approved the proposed arrangement respecting the note along with the proposed arrangement respecting the shares of stock in the cemetery corporation.

14. (a) In furtherance of his plan with respect to the note assignment, Mr. Hebble on September 17, 1943 had the Battle Creek Memorial Park Association execute a promissory note payable to him in the face amount of $29,-250. This note represented a consolidation of three promissory notes that Mr. Hebble had held against the cemetery corporation for a number of years, $29,-250 being the aggregate amount of the principal that remained due and owing to Mr. Hebble on the three prior notes as of September 17, 1943.

(b) The promissory note dated September 17, 1943 was in the following language:
"$29,250
"Battle Creek, Michigan
"*September 17, 1943.*

"On demand after date Battle Creek Memorial Park Association promises to pay to Andrew C. Hebble, or his assigns, Twenty-nine Thousand Two Hundred Fifty ($29,-250) Dollars, together with interest thereon at the rate of six (6%) per cent per annum payable semiannually, for value received.

"Collection of the principal of this note shall not be enforced in any suit at law or in equity, and payment of the principal, or any part thereof, of this note shall not be received or accepted by any holder hereof at any time when such payment will interfere with accumulation of the permanent fund required by law and the articles of incorporation of said debtor Association to be accumulated for perpetual care of Memorial Park Cemetery. The foregoing note is made subject to the foregoing provisions, and the underwritten notice is hereby accepted.

"Battle Creek Memorial
Park Association
"By /s/ A. C. Hebble, *President*
"/s/ M. K. Sabin, *Secretary*"

(c) Immediately after the execution of the note mentioned in paragraphs (a) and (b) of this finding, Mr. Hebble signed the following assignment, which had been prepared on the same sheet with, and below, the note:

"To Battle Creek Memorial Park Association:
"Please Take Notice, that an undivided one-tenth interest in the foregoing note is hereby immediately assigned to Kiwanis Club of Battle Creek, and that on each anniversary of the date of said note an additional one-tenth interest in said note shall be deemed, and shall be automatically assigned by virtue hereof to said Kiwanis Club of Battle Creek until said note and all right, title and interest therein and thereunder shall belong solely to and become and be exclusively the property of said Kiwanis Club of Battle Creek, provided that said Kiwanis Club of Battle Creek shall continue at all times during said period to act faithfully as trustee under The Esther H. Hebble Trust created by said Andrew C. Hebble as settlor by written instrument dated the 17th

day of September, 1943, and said assignment shall be in consideration of such service.

"As a matter of contract hereby made with said Kiwanis Club of Battle Creek, and in consideration of rendition of said services as trustee, I hereby bind my heirs, executors, administrators and assigns to make, execute and deliver any further instruments of assignment deemed necessary or convenient to give full effect to the foregoing and the obligation to do so upon request of said Kiwanis Club of Battle Creek shall be enforceable either at law or in equity.

"Dated the 17th day of September, 1943.

"/s/ A. C. Hebble (L.S.)"
[Signatures of witnesses omitted.]

(d) The trust instrument creating The Esther H. Hebble Memorial Trust (see finding 9) also contained a paragraph referring to the contemporaneous assignment of the promissory note dated September 17, 1943. That paragraph was as follows:

"Sixth

"In consideration of acceptance by said Kiwanis Club of the trust hereby created, the Settlor hereby assigns to said Kiwanis Club in its own right, and not in trust, an undivided one tenth (⅒) interest in a certain note in the principal sum of Twenty-nine Thousand Two Hundred Fifty ($29,250) Dollars, dated the 17th day of September, 1943, bearing interest at the rate of six (6%) per cent per annum, executed by said Association, as maker, to said Settlor as payee, and for each consecutive year after the date hereof in which said Kiwanis Club, as trustee, shall faithfully exercise said trust this instrument shall automatically operate as an assignment to said Kiwanis Club (in its own right and not in trust) of an additional undivided one-tenth (⅒) interest in said note, so that at the end of ten (10) years after the date

hereof, said Kiwanis Club shall be the sole owner of said note, and this assignment, subject to said condition precedent of continued service of said Kiwanis Club as trustee, shall be binding upon the heirs, executors and administrators of said Settlor, and said Kiwanis Club shall be entitled to receive and retain such share of the interest paid from time to time hereafter upon said note as shall represent said Kiwanis Club's then proportionate interest in the principal sum from which said interest shall have arisen, it being hereby expressly provided that said Kiwanis Club shall not sell, assign, pledge or otherwise dispose of its interest in said note, and that said Kiwanis Club shall not at any time bring any suit, at law or in equity, against said Association for recovery of any of the principal which may fall due and be payable upon said note, and that payment of the principal of said note shall not be received or accepted by said Kiwanis Club at any time when such payment will interfere with accumulation of the permanent fund required by law and the articles of incorporation of said Association to be accumulated for perpetual care."

(e) The evidence does not show who drafted the provisions quoted in paragraphs (c) and (d) of this finding, and there is no direct evidence to show whether such provisions were read and understood by Mr. Hebble or the officers representing the Kiwanis Club prior to or at the time of the signing of the respective documents. However, the circumstantial evidence warrants the inference that the note assignment was signed by Mr. Hebble, and the trust instrument was signed by Mr. Hebble and officers of the Kiwanis Club, in ignorance of the fact that such documents contained provisions varying from the oral understanding of the parties that the Kiwanis Club was obligated to use the proceeds which it received from the note exclusively for the benefit of under-

privileged children, and for character-building activities among children generally, in the Battle Creek area.

(f) The promissory note and assignment were delivered to the Kiwanis Club.

15. (a) On September 22, 1943, Mr. Hebble executed and delivered to the Battle Creek Kiwanis Club a further assignment relative to the note dated September 17, 1943. The further assignment provided as follows:

"Whereas Andrew C. Hebble is the holder of a certain note dated September 17, 1943, in the principal sum of Twenty-nine Thousand Two Hundred Fifty ($29,250) Dollars, executed by Battle Creek Memorial Park Association, and bearing interest at the rate of six (6%) per cent per annum, payable semi-annually, subject to the provisions in said note expressed;

"And, whereas, in consideration of services to be rendered by Kiwanis Club of Battle Creek as trustee of a controling [sic] interest in the shares of Battle Creek Memorial Park Association, said Andrew C. Hebble desires to increase the amount to be received by said Kiwanis Club of Battle Creek by virtue of said note:

"Now, therefore, said Andrew C. Hebble, in consideration of One ($1) Dollar and other valuable considerations, receipt of which is acknowledged, does hereby Assign, Transfer and Set Over to said Kiwanis Club of Battle Creek One-Half of all interest which may become payable to said Andrew C. Hebble, his heirs, administrators, executors or assigns, by virtue of said note.

"This assignment shall not be construed to modify or change the assignment provisions dated September 17, 1943, underwritten upon said note and signed thereon by said Andrew C. Hebble, and this present assignment shall apply to interest payable to Andrew C. Hebble, his heirs, executors, administrators or assigns after giving effect, from time to time, to said assignment dated September 17, 1943.

"This present assignment shall be binding upon the heirs, executors, administrators and assigns of said Andrew C. Hebble." [9]

(b) In making the assignment referred to in paragraph (a) of this finding, Mr. Hebble stated that he wanted to increase the income of the club under the note dated September 17, 1943, and that the additional income was to be used for the same purposes as the money received by the Kiwanis Club under the initial assignment.

16. The Battle Creek Memorial Park Association was in a sound financial condition on September 17, 1943, and it has remained in a sound financial condition since that date.

17. (a) The provision in the note dated September 17, 1943 prohibiting the payment of the principal in whole or in part "at any time when such payment will interfere with the accumulation of the permanent fund required by law and the articles of incorporation of said debtor Association to be accumulated for perpetual care of Memorial Park Cemetery" would not have been an obstacle to the payment of one-tenth of the principal to the Kiwanis Club in 1943, or to the payment of one-tenth of the principal to the Kiwanis Club in 1944, if such payments had been desired and requested by the Kiwanis Club.

(b) The assignment on September 17, 1943 to the Battle Creek Kiwanis Club of a one-tenth interest in the promissory note dated September 17, 1943 had a value to the club of $2,925.

(c) The assignment as of September 17, 1944 to the Kiwanis Club of a one-tenth interest in the promissory note dated September 17, 1943 had a value to the Kiwanis Club of $2,925.

9. Date line and signatures of assignor and witness omitted.

18. The 6-percent interest on the note dated September 17, 1943 has always been paid regularly and on time by the cemetery corporation, and the Kiwanis Club of Battle Creek has duly received its proportionate share of such interest under the assignments referred to in findings 14 and 15. During the period 1943–1949, the interest payments to the Kiwanis Club, which aggregated $7,063.88, were not segregated on the books of the club or maintained in a separate bank account. Instead, such interest payments were commingled with the other funds of the club. During that period, however, the Kiwanis Club expended on boys' and girls' social welfare projects, which the club's board of directors regarded as being within the scope of the purposes orally specified by Mr. Hebble in connection with the making of the assignments mentioned in findings 14 and 15, a total of $6,785.98.

19. (a) In a communication dated August 4, 1950, the Kiwanis Club of Battle Creek requested for the first time that part of the principal of the note dated September 17, 1943 be paid by the Battle Creek Memorial Park Association. This request was for a payment of $3,000 of the principal, and it stated in part that:

"The payment is needed now to finance underprivileged youth activities which the Club is supporting through the following recognized charitable organizations, The Boy Scouts of America, The Camp Fire Girls, Michigan Childrens Aid, Charitable Union, Community Chest, Y.W.C.A., Y.M.C.A., Family Counseling Service and the Salvation Army."

(b) The partial payment of principal in the amount of $3,000 requested by the Kiwanis Club on August 4, 1950 was made by the Battle Creek Memorial Park Association soon after the receipt of the request.

20. At about the time of the receipt by the Battle Creek Memorial Park Association of the request mentioned in finding 19, Mr. Hebble learned that the previous interest payments under the note had not been segregated on the books of the Kiwanis Club or maintained in a separate bank account. He remonstrated with the Kiwanis Club concerning the failure of the club to handle the Hebble gift separately from the club's other funds. Thereafter, on October 26, 1950, the Kiwanis Club of Battle Creek adopted resolutions stating in part as follows:

"* * * Whereas, the Club has annually from 1943 to the present received, and will annually until the year 1952 continue to receive, by assignment from said Andrew C. Hebble, a one-tenth part of a note payable to him by the said Association in the amount of $29,250.00, together with interest on said assigned part, to be used for the charitable and educational purposes mentioned below; and

"Whereas, it has been understood at all times between said Andrew C. Hebble and the officers and directors of this Club that * * * all amounts of principal or interest received by the Club on the said note, were to be used by the Club, as Trustee, for purely charitable or educational work on behalf of underprivileged or needy youths in Battle Creek and vicinity, and were not to be used for the operating expenses of the Club; and

"Whereas, the Club has each year paid out on such charitable and educational projects for the young a much greater amount that has been received on the note * * * but there has not heretofore been an allocation of amounts received on the note to such specific charitable and educational uses; and

"Whereas, the receipt this year for the first time of a substantial payment on the principal amount of the note makes it important that the

Club properly account for the use of the amounts received on the note; and

"Whereas, the said Andrew C. Hebble has objected to the failure of this Club to establish separate ledger accounts for recording the assignments of the note, cash receipts on the note, * * * and payments for the said charitable and educational purposes, and to the failure to place all such funds in a separate bank account;

"Be It Resolved, That this Club direct its Treasurer, or other officer in charge of such records, to take the following action:

"1. Set up on its books of. account a ledger account for the portion of the Association note which is annually assigned to this Club which account is to be known as the Hebble Trust (Note) Account, which is, as of September 30, 1950, as follows:

Hebble Trust (Note) Account

| Date | Dr. | Cr. | Balance |
|---|---|---|---|
| 1943/1949 ......... | $20,475.00 | ............ | ............ |
| Aug. 7, 1950 ...... | ............ | $3,000.00 | ............ |
| Sept. 17, 1950 .... | 2,925.00 | ............ | ............ |
| | 23,400.00 | 3,000.00 | $20,400.00 |

"(a) Debit to such ledger account the amounts of the several assignments which have become effective on September 17 of each year from 1943 to the present and which will continue to be effective from the present to and including the year 1952.

"(b) Credit to the ledger account all amounts which have been received on the principal of the note and all amounts which are received in the future.

"2. Set up on its books a ledger account to be known as the Hebble Trust (Cash) Account, which is, as of September 30, 1950, as follows:

Hebble Trust (Cash) Account

| Date | Dr. | Cr. | Balance |
|---|---|---|---|
| 1944/1949 ........ | $7,063.88 | ............ | ............ |
| Dec. 31, 1949 ..... | ............ | $6,785.98 | $277.90 |
| March, 1950 ...... | 745.87 | ............ | ............ |
| August, 1950 (Note principal).. | 3,000.00 | ............ | ............ |
| August, 1950 ..... | ............ | 714.50 | ............ |
| Sept., 1950 ....... | 745.88 | ............ | ............ |
| Sept., 1950 ....... | ............ | 809.41 | ............ |
| | 11,555.63 | 8,309.89 | 3,245.74 |

"(a) Debit to such ledger account all amounts of interest and principal which have heretofore been received on the note.

"(b) Debit to the same ledger account all amounts hereafter received on said note * * *.

"(c) Credit to the ledger account all amounts heretofore paid out by the Club for the said charitable and educational purposes, which are determined as properly chargeable against the amounts received on the note.

"(d) Credit to the ledger account all amounts hereafter paid out of amounts debited to the ledger account.

"3. Place in a special bank account the present unexpended balance of $3,245.74, representing the excess of amounts received on the note over amounts chargeable against such receipts, and handle all future amounts which are to be debited or credited to the ledger account through such special bank account. * * * "

21. The procedures prescribed in the resolutions of October 26, 1950 have been duly followed by the Kiwanis Club of Battle Creek.

22. (a) A second partial payment, amounting to $3,000, of the principal of the note dated September 17, 1943 was. made in 1954 by the Battle Creek Memorial Park Association to the Kiwanis. Club of Battle Creek at the latter's request.

(b) A third partial payment, amounting to $8,000, of the principal of the note dated September 17, 1943 was made in 1955 by the cemetery corporation to the Kiwanis Club of Battle Creek at the request of the latter.

(c) No other payment of the principal of the note dated September 17, 1943 had been requested or made as of the date of the trial in this case, and there was then due on the note a balance of $15,250.

23. The funds derived from the payments of interest and principal under the note dated September 17, 1943 have been devoted by the Kiwanis Club of Battle Creek exclusively to objects which the club's board of directors regarded as being within the scope of the purposes orally outlined by Mr. Hebble in connection with the making of the assignments referred to in findings 13–15. None of these funds has ever been used to defray expenses of the Kiwanis Club, including expenses incurred by the club in administering the Hebble gift.

24. The Kiwanis Club of Battle Creek has never, by propaganda or otherwise, attempted to influence legislation.

Administrative Proceedings.

25. (a) Mr. Hebble duly filed with the Collector of Internal Revenue for the District of Michigan his Federal income tax return for the calendar year 1943. This return disclosed an income tax liability of $20,557.02, which was duly paid to the collector. In the return, Mr. Hebble showed charitable contributions totaling $21,847.60; and of this total amount, he deducted from income $6,195.59 in accordance with the statutory 15-percent limitation based on the net income disclosed in the return. The total amount of $21,847.60 shown in the return as contributions was comprised in part of $2,925 representing the assignment to the Kiwanis Club on September 17, 1943 of a one-tenth interest in the promissory note for $29,250, in part of $15,000 representing the claimed value of the 300 shares of stock in the Battle Creek Memorial Park Association transferred to the Kiwanis Club at the same time, and in part of other contributions in the aggregate amount of $3,922.60.

(b) The Commissioner of Internal Revenue allowed as a proper deduction the various contributions aggregating $3,922.60 mentioned in paragraph (a) of this finding, but disallowed the remainder of the $6,195.59 contributions deduction taken in the return. The Commissioner thus failed to make any allowance with respect to the assignment of a one-tenth interest in the $29,250 note or the transfer of the cemetery corporation stock in 1943. This partial disallowance of the contributions deduction, together with another adjustment whereby the dividends received by Mr. Hebble in 1943 were increased to the extent of $100, resulted in the determination of an income tax deficiency in the amount of $1,523.22 against Mr. Hebble for 1943. The deficiency, with interest thereon in the amount of $464.58, was paid by Mr. Hebble to the collector on April 25, 1949.

26. (a) Mr. Hebble duly filed his Federal income tax return for the calendar year 1944 with the Collector of Internal Revenue for the District of Michigan. This return disclosed an income tax liability of $26,690.09, which was duly paid to the collector. In the return, Mr. Hebble deducted $5,572.14 from income as the amount of his contributions. The deduction of $5,572.14 included an amount of $2,925 representing the assignment to the Kiwanis Club in 1944 of an additional one-tenth interest in the promissory note dated September 17, 1943.[10]

(b) The Commissioner of Internal Revenue disallowed the deduction of $2,925 referred to in paragraph (a) of this finding. This disallowance resulted in the determination against Mr. Hebble of an income tax deficiency in the amount of $2,216.46 for 1944. Such deficiency, with interest thereon amounting to

---

10. The total amount of the 1944 contributions did not exceed the statutory 15-percent limitation.

$543.03, was paid to the collector on April 25, 1949.

27. (a) On January 29, 1951, Mr. Hebble filed with the Internal Revenue Service a claim for the refund of the $1,-987.80 that had been paid by Mr. Hebble on April 25, 1949 as the amount of the income tax deficiency and interest for the year 1943 (see finding 25). The claim was based upon the contention that the amount of $2,925 representing the assignment to the Kiwanis Club in 1943 of a one-tenth interest in the note dated September 17, 1943 should have been allowed (subject to the statutory 15-percent limitation on contributions) as a deductible contribution under Section 23 (*o*) of the Internal Revenue Code of 1939.

(b) Although the total amount of the deficiency and interest paid for the year 1943 was claimed by Mr. Hebble, the claim did not contain any allegations purporting to show wherein the portions of the deficiency and interest allocable to the $100 adjustment respecting dividends had been improperly collected.

28. On January 29, 1951, Mr. Hebble also filed with the Internal Revenue Service a claim for the refund of the $2,-759.49 that had been paid by Mr. Hebble on April 25, 1949 as the amount of the income tax deficiency and interest for 1944 (see finding 26). The ground asserted in support of the claim was that the amount of $2,925 representing the assignment to the Kiwanis Club in 1944 of a one-tenth interest in the note dated September 17, 1943 should have been allowed as a deductible contribution under Section 23(*o*) of the Internal Revenue Code of 1939.

29. Mr. Hebble was advised by a registered letter dated July 11, 1951 that his refund claims for the years 1943 and 1944 had been disallowed in full by the Internal Revenue Service.

30. The present litigation was instituted by Mr. Hebble on June 30, 1952 because of the disallowance of the claims mentioned in findings 27 and 28.

31. Mr. Hebble died in October 1953. He was then in his 91st year.

### Conclusion of Law.

Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover, together with interest as provided by law, and judgment will be entered to that effect. The amount of recovery will be determined pursuant to Rule 38(c) of this court.